**Stephen Lunt WAYNE, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 1013–86.

Court of Criminal Appeals of Texas.

June 15, 1988.

Rehearing Denied Sept. 14, 1988.

Ronald D. Hinds (on appeal only), Dallas, for appellant.

Henry Wade, Former Dist. Atty. & John Vance, Dist. Atty. & Ruth E. Plagenhoef, Mark Hasse, Marcus Busch, Pamela Sullivan Berdanier & Constance M. Maher, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

Before W.C. DAVIS, WHITE, DUNCAN, CLINTON, TEAGUE, CAMPBELL and MILLER, JJ.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

W.C. DAVIS, Judge.

Appellant was convicted of the offense of possession with intent to deliver amphetamine, a controlled substance. The jury assessed punishment at 35 years in the state penitentiary and a $25,000 fine. Art. 4476–15, § 4.031.[1]

On direct appeal, appellant asserted five points of error. He claimed he was entrapped as a matter of law, that the trial court erred by admitting into evidence various statements and exhibits, and that the

trial court erred in denying his motion for dismissal under the Speedy Trial Act. The Fifth Court of Appeals found there was no entrapment as a matter of law and that appellant failed to meet his burden to show that the State was not ready within the time limit under the Act.[2] However, the Court of Appeals agreed with appellant that the trial court "erred in admitting for jury consideration statements made by appellant during a plea bargaining session" and reversed the conviction. *Wayne v. State,* 718 S.W.2d 393 (Tex.App.—Dallas 1986). Due to its disposition of appellant's second point of error, the appeals court did not address the remaining points of error.

We granted the State's petition for discretionary review to determine the correctness of that court's holding that the inculpatory statement made by appellant to a law enforcement officer in a conversation initiated by appellant two days after his arrest could not properly be used for impeachment purposes. We will reverse the judgment of the appeals court below and remand this case to that court for further consideration consistent with this opinion.

The record reflects[3] that appellant was introduced to Rick Easterwood, a Texas Department of Public Safety (DPS) undercover narcotics investigator, by a police informant. Easterwood bought an ounce of amphetamine from appellant and indicated his interest in obtaining five pounds of the controlled substance. Over a period of about one month appellant and Easterwood met several times and remained in close contact by telephone, the subject of conversation being appellant's ability and

1. Sec. 4.031 provides in pertinent part:
   (a) Except as authorized by this Act, a person commits an offense if he knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 2.
   \* \* \* \* \* \*
   (d) An offense under Subsection (c) of this section is:
   \* \* \* \* \* \*
   (2) punishable by confinement in the Texas Department of Corrections for life or for a term of not more than 99 years or less than 10 years, and a fine not to exceed $100,000, if the amount of the controlled substance manufac-

tured, delivered, or possessed with intent to manufacture or deliver is, by aggregate weight, including any adulterants or dilutants, 400 grams or more.

2. The Court of Appeals decided the instant cause several months before this Court handed down its opinion in the case of *Meshell v. State,* 739 S.W.2d 246 (Tex.Cr.App. 1987) wherein it was held that Art. 32A.02, V.A.C.C.P. was an unconstitutional statute.

3. We borrow liberally from the statement of facts given by the Court of Appeals.

progress in obtaining the five pounds of amphetamine. Easterwood demonstrated his "willingness" and "credibility" by showing appellant a large amount of cash during one of these visits.

Approximately one month after being introduced to Easterwood, appellant informed the narcotics officer that he had three pounds of amphetamine available. The "buy" was set for that afternoon in the parking lot of a restaurant in Grand Prairie.

Bob Shedd, another DPS narcotics investigator, testified that he was asked by Easterwood to videotape the drug transaction from a van used by the Department for covert surveillance operations. Rick Easterwood and his brother Dan arrived at the parking lot shortly after 5:30 p.m. Rick Easterwood was wired for sound, with the relay being located in Shedd's van.

Five minutes after the undercover officers' arrival, a white Firebird automobile pulled up next to the Easterwood's gray Volvo. A gold-colored Camaro automobile pulled in behind the white car. Rick Easterwood exited his vehicle and got into appellant's vehicle. Once inside, appellant reached into the back and showed Easterwood a lavender purse containing about one-half of the three pounds appellant had agreed to sell. When Easterwood complained about the shortage, appellant told him "I got to get it" and walked over to the gold Camaro and talked with the driver. Upon returning to his car, appellant was placed under arrest. The driver of the gold Camaro, one Tommy Lowe, was also arrested after a short chase. After receiving written permission to search Lowe's vehicle, officers recovered a second bag of amphetamine weighing approximately one and a half pounds. A search of appellant's own vehicle also turned up a 9mm semi-automatic pistol and a police scanner. The instant prosecution followed.

During the trial, appellant testified that he had never dealt in drug quantities in

excess of one gram and that he was coerced by the police into selling the large quantity of amphetamine on the afternoon in question. To rebut appellant's testimony, the State recalled Officer Easterwood to the stand and in a hearing outside the jury's presence elicited the incriminating statement made by appellant to the officer two days after appellant's arrest to the effect that appellant was "the largest independent amphetamine dealer" in the area. Appellant had sent a message through his girlfriend asking to speak with Easterwood. Appellant did not testify at the hearing.

After hearing the proffered testimony over appellant's objection that the statement was made during the plea negotiation process,[4] the trial judge entered his ruling on the matter:

THE COURT: All right. The objection must be overruled, the ruling of the Court being that the Court perceives that the defendant has left an impression with the jury, or testified to the jury that he does not deal in large volumes, he is— any of his prior controlled substance transactions have been relatively minor in nature.

*The court feels that this is proper impeachment for such testimony and will overrule the objection.* (Emphasis supplied)

Thereafter, the following exchange was allowed when the jury was returned to the courtroom:

BY MR. HASSE:

Q Investigator, after the arrest of Stephen Lunt Wayne on December the 10th, 1984, was a message gotten to you regarding your going to talk to this defendant?

A Yes, sir.

Q In response to that message, did you in fact go talk to the defendant?

A Yes, sir.

4. Appellant also objected on grounds that the statement did not meet the requirements of Art. 38.22, V.A.C.C.P. Due to its disposition of point of error number two, the Court of Appeals never reached this issue contained in an additional point of error. We therefore decline to address the contention.

Q   Is it your understanding he had been Mirandized previously by your brother, Dan Easterwood?

A   Yes, sir.

Q   And didn't you—

MR. LOLLAR: Object to that last question and answer as hearsay.

THE COURT: Overruled.

Q   (By Mr. Hasse) When you talked to this defendant, did he make any statement to you about being an independent dealer or—

MR. LOLLAR: Objection as to leading question, first of all, object to that being a leading question.

THE COURT: Sustained. Rephrase your question, please.

Q   (By Mr. Hasse) All right. What statement did he make to you, if any, about the size or nature of his dealings?

MR. LOLLAR: To which we object on the grounds raised in the sub rosa hearing.

THE COURT: Overruled.

A   During the course of our conversation, I just asked the defendant what he had been doing in the way of drug dealing in the metroplex area, and he made the statement to me that he was the largest independent amphetamine dealer in the Dallas metroplex area.

In its sole ground for review, the State alleges that the Court of Appeals erred in holding that the voluntary statement of appellant could not be used for impeachment, and gives as a reason for review that said holding is contrary to the decisions of this Court. See Tex.R.App.Proc.R. 200(c)(3).

Under this ground, the State argues that the appeals court below "erred in adopting the defense characterization of the appellant's voluntary statement as a plea negotiation where the appellant never offered nor contemplated pleading guilty." Appellant responds by asserting the record reflects the State's own witness agreed that the incriminating statement in question occurred during plea bargain negotiations.

The basis for appellant's claim and the holding by the Court of Appeals is reflected in the voir dire of Investigator Easterwood by defense counsel during the hearing held outside the jury's presence:

BY MR. LOLLAR:

Q   Investigator, that was after—when was that?

A   I'm not sure of the date. It was about two days after the 10th. It was shortly after the arrest.

Q   And he was also making that to you so you would use him as an undercover agent yourself?

A   What's that?

Q   He was making that statement to you so you would use him as a snitch for you?

A   Well, we were trying to find out whether he had the kind of information that we would be interested in.

Q   And in fact you did make an offer to him that if he would turn some labs for you that you would help him on this case?

A   Yes, sir.

Q   Okay. So actually this is in kind of a plea negotiation-type setting that you were making these conversations; is that correct?

A   Just trying to get some kind of grasp on whether or not his information was, number one, valid, or if it was the kind of information that we would be interested in, or that maybe another police agency might be interested in.

Q   Okay. But in response to my question, I guess your answer is yes, then, this was in kind of a plea negotiation-type deal, you were seeing what you could get out of him and he was seeing what he could get out of you in return—

A   Yes, sir.

Q   —in regards to this case?

A   Yes, sir.

Q   Okay. Now, you didn't use him as a snitch for you following that time, did you?

A   No, sir.

Q   And that is a common practice of the DPS and other law enforcement agen-

cies, after you've made an arrest on a drug case you frequently use those people as snitches?

A If the circumstances will allow, yes.

Q And depending on what information they say they've got for you?

A Yes.

MR. LOLLAR: That's all we have in regard to the question, Your Honor.

The court below not having passed upon the propriety of admitting appellant's statement under the auspices of Art. 38.22, supra, the sole issue for our determination is whether the conversation between appellant and Officer Easterwood may properly be characterized as a plea bargaining session or plea "negotiations" wherein appellant was induced by promise or specific offer to make an inculpatory admission.

Recently this Court had reason to explore the plea negotiation process in a mandamus action brought for our consideration. Although factually different from the case at bar, our discussion in the case of *Perkins v. Court of Appeals*, 738 S.W. 2d 276 (Tex.Cr.App. 1987) regarding the "definition" of the term "plea bargaining" is instructive. From his inexhaustible supply of resource material, Judge Teague wrote for the majority:

We find that it is sufficient for our purposes to point out that 'plea bargaining' is usually defined as follows: 'Plea bargaining is a process which implies a preconviction bargain between the State and the accused whereby the accused agrees to plead guilty or nolo contendere in exchange for a reduction in the charge, a promise of sentencing leniency, a promise of a recommendation from the prosecutor to the trial judge as to punishment, or some other concession by the prosecutor that he will not seek to have the trial judge invoke his full, maximum implementation of the conviction and sentencing authority he has,' i.e., it is the process where a defendant who is accused of a particular criminal offense, and his attorney, if he has one, and the prosecutor enter into an agreement which provides that the trial on that particular charge not occur or that it will be disposed of pursuant to the agreement between the parties, subject to the approval of the trial judge. Put another way, 'plea bargaining is the process by which the defendant in a criminal case relinquishes his right to go to trial in exchange for a reduction in charge and/or sentence.'

Id. at 282 (citations omitted).

■ From the definitions above, it is clear that the plea bargain process requires (1) that an offer be made or promised, (2) by an agent of the State in authority, (3) to promise a recommendation of sentence or some other concession such as a reduced charge in the case, (4) subject to the approval of the trial judge.

Prior cases before this Court are also instructive in detailing when an offer or promise is made within the plea bargain process. The Court of Appeals relied upon *Walker v. State*, 626 S.W.2d 777 (Tex.Cr. App. 1982); *Washington v. State*, 582 S.W. 2d 122 (Tex.Cr.App. 1979), and *Fisher v. State*, 379 S.W.2d 900 (Tex.Cr.App. 1964), as well as *United States v. Robertson*, 582 F.2d 1356 (5th Cir.1978) for the proposition that:

An incriminating statement is rendered inadmissible if it is induced by promises that are: (1) positive; (2) made or sanctioned by someone in authority; (3) of some benefit to the accused; and (4) of such character as would be likely to influence the accused to speak untruthfully.

*Wayne*, supra at 396.

See also *Freeman v. State*, 723 S.W.2d 727 (Tex.Cr.App. 1986); *Hardesty v. State*, 667 S.W.2d 130 (Tex.Cr.App. 1984). Cf. *Wicker v. State*, 667 S.W.2d 137 (Tex.Cr.App. 1984); *Fields v. State*, 627 S.W.2d 714 (Tex.Cr.App. 1982).

*Fisher*, supra, raised the issue of voluntary confession in the context of that trial court's refusal to submit a requested charge as to the voluntary nature of the confession made by that appellant to his employer, Charles Jackson, a service station owner. It appears that five automobile tires were discovered missing and suspicion centered on Fisher. While first de-

nying guilt, Fisher later confessed to the theft, after Jackson promised he would help pay for the tires, would not terminate Fisher's employment, would not call the police and would not press charges against his employee.

This Court ultimately reversed the judgment on grounds that the requested instruction should have been given, along the way making note of general rules regarding the admissibility of confessions. In the early case of *Searcy v. State*, 28 Tex.Cr. App. 513, 13 S.W. 782, (1890), the Court had found a confession induced by a sheriff inadmissible, where the peace officer, after warning the suspect, told him if he, the suspect, would tell him "all about it, so that the Sheriff could get all the guilty parties," the sheriff "would do what he could for him in his case." Id. The promise there was a "positive and persuasive one ... calculated to make the defendant believe that his condition would be bettered by making the confession." Id. The confession induced by such general promise was therefore improperly admitted.

In *Fisher*, supra, we enunciated the general test to determine whether there was a sufficient inducement to suppress a facially valid confession:

> to render a confession inadmissible upon the ground that it was induced by the promise of some benefit to defendant, such promise must be positive, and must be made or sanctioned by a person in authority and it must also be of such character as would be likely to influence the defendant to speak untruthfully." *Fisher*, 379 S.W.2d 902, citing 1 Branch 2d Sec. 88.1 page 95.

In applying this test or rule, the Court found that the question must be put subjectively rather than objectively, "[T]hat is, if the influence applied was such as to make the defendant believe his condition would be bettered by making a confession, true or false, then the confession should be excluded. On the other hand, if this is not true then the confession is admissible." *Fisher*, supra, at 902.

The "influence applied," in turn, must originate from a "person in authority."

The *Fisher*, supra, Court adhered to the rule announced earlier in the case of *Ethridge v. State*, 133 Tex.Cr.R. 287, 110 S.W. 2d 576 (Tex.Cr.App. 1937):

> "The actual relation between the parties, and perhaps the relation as it actually appeared to the accused, is the controlling factor.
>
> \*    \*    \*    \*    \*    \*
>
> The test is whether the accused was likely to view the promise as authoritative, and this test is to be determined by the standard of the person confessing. The injured party, the employee of the accused, and officers, have been held to be within the meaning of 'persons within authority.' "

Id. at 577, citing *Wharton* on Criminal Evidence, Sec. 650–a. See also *Clark v. State*, 119 Tex.Cr.R. 50, 45 S.W.2d 575 [officer taking confession is 'person in authority'], *Hanus v. State*, 104 Tex.Cr.R. 543, 286 S.W. 218. [Among the persons coming within the meaning of 'persons in authority' are officers and prisoners, the injured party and the accused, and employer and employee.]

*Walker v. State*, supra, involved a confession obtained as a result of an inducement for leniency in sentence and dropping of criminal charges against that appellant's mother. After a hearing to determine the admissibility of the confession, the trial court admitted the incriminating custodial statement into evidence. Judge McCormick, writing for a panel of the Court reversing the judgment, wrote:

> It is uncontroverted and acknowledged by the officers involved that the confession used in evidence in this case was obtained as the result of an expressed 'deal' made with the uncounselled appellant and suggested by the police officers and representatives of the district attorney's office. The deal was that if appellant 'cleared up' all of his burglaries and signed the confession he would not get more than ten years in the Texas Department of Corrections, and criminal charges that were then pending against his mother, who was in jail, would be

dismissed. An officer testified that appellant was anxious to help his mother. *Walker*, supra, at 778.

It is instructive to note that the evidence unmistakably showed an express "deal" with concrete terms, suggested by both police officers and representatives of the prosecutor's office, again in exchange for the defendant's confession to the charged offense.

*Washington*, supra, another panel opinion of the Court, presented an unusual fact situation involving a plea bargain. In the trial judge's chambers just before trial, a bargain was struck which provided that appellant would enter a guilty plea to the offense of burglary and sign a stipulation of evidence admitting guilt in return for the opportunity to take a polygraph examination. If the appellant passed the test, the State promised to join in a motion for new trial. A new trial was subsequently granted but the appellant was reindicted for the offense of theft and the stipulation was introduced at his trial.

We reversed the conviction, first noting that the "stipulation" was a confession, then going on to find that it was inadmissible as a matter of law under *Fisher*, supra, due to the circumstances under which it was obtained. A benefit, a polygraph examination to establish innocence, was promised. The promise was "positive" rather than equivocal: the State guaranteed the test and additionally promised to join in a motion for new trial. The prosecutor, one of the promisors, was clearly a "person in authority." Additionally, the plea negotiations were conducted in the trial judge's chambers, his presence at least tacitly sanctioning the inducement. Finally, the circumstances of the promise given made the defendant "inclined to admit a crime he had not committed...." Id. at 124, citing *Fisher*, supra, at 902, since the testimony from all parties involved in the plea negotiations showed that appellant gave no indication he would plead guilty until he was guaranteed the right to take the polygraph examination and clear himself. Under such circumstances, "a person intending to tell the truth on the exam would have nothing to lose by confessing, but would have the possibility of the ultimate gain of having the charges dismissed." Id.

Before leaving our opinion in *Washington*, supra, we do note that Judge Clinton drew a distinction under this last prong of the "inducement test" from the "usual" plea bargain situation:

> This case differs importantly from the usual plea bargain situation in which the defendant accepts a sure conviction with whatever accompanying punishment in exchange for a guilty plea. While we do not say that such a plea bargain would never come within the test of *Fisher*, we presume that a defendant would be much less likely to admit to a crime not performed when he is faced with a sure conviction, albeit a less serious conviction than the offense charged. Appellant, however, faced a situation in which a truthful polygraph examination would result in no worse of a position for himself than prior to the confession, but could potentially secure his release. Such circumstances would very likely amount to an irresistible pressure to sign a confession even though the defendant is innocent.

*Washington*, supra, at 124.

Again, in *Washington*, supra, that defendant bargained for some benefit in exchange for a statement stipulating evidence proving his guilt in the charged offense. Thus, on the facts of each of the cases relied upon by the Court of Appeals, the particular defendants bargained for a benefit; their statements, entirely inculpable in nature as to the particular offense for which they were charged, were induced by a person or persons in authority who would themselves benefit from the particular confessions. The "statements" found to be improperly induced went to a particular criminal act, and were not simply a statement as to the defendant's general character or reputation.

As further authority for its holding, the Dallas Court of Appeals turns to the federal system. In its en banc rehearing of *United States v. Robertson*, supra, the

Fifth Circuit Court of Appeals reached the question whether certain admissions made by the appellant in a post-arrest parking lot conversation he had with a confederate and two agents of the Drug Enforcement Agency were made during the course of plea negotiations, therefore rendering the admissions inadmissible.

The court first engaged in a discussion of the importance of guilty pleas and the safeguards surrounding the entire plea negotiation process, then focused upon the question of determining whether a discussion should be characterized as a plea negotiation under the totality of circumstances as viewed subjectively by the alleged promisee. To this end, the Court concluded, a two-tiered analysis should be applied, wherein the trial court must determine "first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable, given the totality of the objective circumstances." *Robertson*, supra, at 1366.

The first step of inquiry focuses upon the subjective state of mind of the suspect, to distinguish between discussions or conversations in which an accused merely makes an admission or perhaps merely remarks upon some general characteristic or subject, and those statements made during discussions in which the accused is seeking to negotiate a plea bargain. In those situations in which the accused's subjective intent is clear and the objective circumstances demonstrate that a plea bargain expectation is reasonable, the inquiry may end. Id. at 1367. Where the record does not reflect a clear expression of an accused's subjective intent to bargain or pursue plea negotiations, an accused's after-the-fact expressions of his intent must be evaluated more closely. The trial court "must focus searchingly on the record to determine whether the accused reasonably had such a subjective intent, examining all of the objective circumstances." Id. [citations omitted]

In *Robertson*, supra, the Fifth Circuit had to examine that appellant's statements

in light of the second tier of the inquiry. The court noted that confessions or admissions made outside the fabric of the plea negotiation process are still admissible. Id; see also *Hutto v. Ross*, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976). As the court stated:

> It is reasonable to assume that the cooperation of an arrested person often is prompted by a desire for leniency for himself or others. Statements or confessions made in such circumstances, if they are voluntary and made with full awareness of the person's rights, are reliable, probative and constitutionally admissible evidence.

*Robertson*, supra, at 1368.

Applying the above analysis to the facts of the case, the Fifth Circuit found appellant's parking lot conversation *not* part of a plea negotiation process:

> From a careful study of the record facts, we cannot conclude that Robertson and Butigan engaged in the parking lot conversation with a view toward negotiating a plea agreement. There was something of an attempt at bargaining for a government concession here: Robertson and Butigan attempted to bargain with the DEA agents for the immediate release of the women. And, they did receive something of a government concession: the DEA agents told them that, although the agents themselves could not make any deals regarding the women, whatever they did or said would be brought to the attention of the 'Judicial Authorities.' However, even assuming *arguendo*, that there was bargaining and a government concession, the quintessential *quid* of a plea negotiation *quid pro quo* was missing. The only concession which Robertson and Butigan offered, and the only concession which the government received then, was a confession. Robertson and Butigan did not contemplate entering a plea of guilty in order to obtain the release of the women. A bargained confession, without more, is not a plea negotiation. Our emphasis will be on this aspect of the plea negotiation process; we focus on what Robertson and Butigan were contemplating con-

ceding during the parking lot conversation.

Id. at 1368–69.

Finally, the appeals court below relies on *Richardson v. State*, 667 S.W.2d 268, (Tex. App.—Texarkana 1984, pet. ref'd). As in *Fisher* and *Walker*, both supra, the Texarkana Court of Appeals was faced with an unambiguous situation in which the State had entered into plea negotiations with that appellant. During the guilt-innocence stage of trial the State was allowed to introduce several "statements damaging to his defense" which appellant had made during the course of negotiations. The appeals court reversed that appellant's conviction, noting the context in which the statements had been induced:

> the aborted plea bargain was negotiated in the district attorney's office with the district attorney, a special prosecutor, and several other law enforcement officers present. Richardson was fully warned of his rights and his attorney was present at all times during the negotiations. The State concedes, and it was proven without dispute, that *in order to induce Richardson to plead guilty and testify* to the criminal activity he was promised that the district attorney would recommend a five year sentence, he would be given trusty status immediately upon beginning his imprisonment, he would be able to select the prison unit of his choice, and the law enforcement officers would use their influence to get him a parole as soon as possible.

*Richardson*, supra, at 269.

Unlike the case in *Fisher* or *Walker*, both supra, the opinion in *Richardson*, supra, does not reflect the exact statements made by appellant, only that the statements were made during the plea negotiation process later aborted. But, as that court stated, the laws of this State and prior case law from this Court show "the clear intent that *any* statement made in negotiating a plea bargain is not to be used against the accused if the plea bargain is not completed." See Art. 26.13, V.A.C. C.P.; see also *Dean v. State*, 72 Tex.Cr.R. 274, 161 S.W. 974 (Tex.Cr.App. 1913).

That this prohibition is intended to have a prophylactic effect is without doubt. Whether the initial offer is made by a criminal defendant or by an agent of the State does not matter. In *Dean*, supra, this Court found the trial court below to have correctly sustained that appellant's objections to any mention of appellant, through her attorney, ever having *agreed* to enter a plea of guilty.

Later, in the case of *Stafford v. State*, 67 S.W.2d 285 (Tex.Cr.App.1934), this Court followed *Dean*, supra, in finding error in the State's attempt to impeach that defendant's complete denial of the crime on cross-examination by inquiring whether it was not true that the defendant had offered to plead guilty in exchange for dismissal of another charge. We reversed the conviction because "such matter [attempted bargaining] is not admissible."

In the present case we are not dealing with a confession to the crime charged, as in *Fisher* and *Walker*, both supra; the instant cause presents a scenario more similar to that in *Richardson*, supra, where some type of "incriminating statements" were made. There is no question that appellant's comment, whether truth or merely the product of bravado, is incriminating in nature if not specifically tying appellant to the charged offense. And the incriminating nature of the statement is unquestioned when seen in the context of impeachment. Still, that fact alone will not cause us to find error as the case is presented to us from the appeals court below unless we determine that the discussion or conversation was part or parcel of the plea negotiation process, for it is within that context appellant contends his statement was induced. Keeping in mind the definitions gleaned from *Perkins*, supra, tests enunciated in *Fisher* and *Walker*, both supra, and the analysis in *Robertson*, supra, which complements our own analysis on the issue, we will turn our attention to the particular facts of the case at bar.

Here, as in *Robertson*, supra, appellant's expression of a subjective desire to "negotiate" came after the fact, if indeed at all. The record reflects no evidence that appel-

lant himself testified to any sort of plea negotiation before the jury *or* outside their presence. However, assuming arguendo that he did make such a decision, or attempt to bargain, there is nothing in the record to show his express desire to negotiate, only the implicit inferences which may be drawn from the circumstances surrounding the conversation between appellant and Officer Easterwood while appellant was in custody.

The Dallas Court of Appeals appears to have used the "subjective" test cited in *Fisher* and *Robertson,* both supra, without closely scrutinizing all the objective circumstances of the conversation "to determine whether the accused reasonably had such a subjective intent...." *Robertson,* supra, at 1367. We believe that the subjective inquiry, especially in cases dealing with after-the-fact claims that plea negotiations took place, must be balanced by testing those claims within the objective environment of the case with close scrutiny of all the circumstances surrounding the conversation or discussion. As succinctly stated by the *Robertson,* supra, Court, "the objective record must establish that the accused's statements were made in a reasonable belief that he was negotiating a plea agreement." Id.

In reaching its decision, the Dallas Court of Appeals concluded that all four parts of the *Fisher* test were met:

(1) Easterwood's promise is positive— if appellant was used as an informant, Easterwood 'would help him on this case;' (2) Easterwood was a law enforcement officer, a person in authority; (3) appellant would benefit from the plea bargain by having a police officer 'help him on this case;' (4) the circumstances were such as would likely influence appellant to speak untruthfully due to the fact that he wanted to appear to be an important, influential person in drug-related activities, to induce the police to use him as an informant.

*Wayne,* 718 S.W.2d at 396.

Viewed objectively at the time the conversation in question took place, the record reflects (1) appellant sent a message through his girlfriend to Easterwood, asking the officer to come see him in jail; (2) sometime during the course of the conversation Easterwood offered to "help" appellant in "this case" in some unspecified manner if appellant would help him "turn some (drug) labs"; (3) appellant was apparently desiring to become a "snitch" for Easterwood; (4) to show his knowledge of the Dallas drug scene and apparent worth as a "snitch," appellant stated that he was the "largest independent amphetamine dealer in the metroplex"; (5) Easterwood's brother-officer had *Mirandized* appellant prior to the conversation; and (6) Easterwood himself agreed to defense counsel's terming the conversation a "plea negotiation-type setting" or "plea negotiation type deal."

From the facts above and through careful examination of the testimony in this case, we are unable to conclude from the record that the discussion between appellant and Easterwood can fairly be characterized as "plea negotiations." We do not know the specifics of why appellant asked to see Easterwood or the specifics of the conversation between them. The record does not show any express desire to negotiate by appellant; at most there is shown a general desire to appear as a worthy candidate for informant status at some unspecified future point in time.

All the implicit inferences favorable to appellant under the *Robertson,* supra, analysis are derived on cross-examination of Easterwood. Defense counsel asked him if the statement was made "so you would use him as a snitch for you?" and Easterwood responded with the rather vague answer that "we were trying to find out whether he had the kind of information that we would be interested in." The defense attorney pinpointed the probable *reason* for meeting with appellant in the following exchange:

Q And in fact you did make an offer to him that if he would turn some labs for you that you would help him on this case?

A Yes, sir.

Following that exchange, defense counsel rather generally characterized the offer in terms of a plea-*"type"* negotiation or deal, where "you were seeing what you could get out of him and he was seeing what he could get out of you ... in regards to this case." Easterwood simply responded, "Yes, sir."

Taking for the moment Easterwood's response as agreement that *he* considered the joint conversation some type of a "plea-type" negotiation, there is still *no subjective* evidence that *appellant* thought the discussion was part of the plea process in the instant case. There is no express showing, not even an after-the-fact expression, of a desire to negotiate a plea on appellant's part or on his behalf.

Moreover, the circumstances surrounding the event do not reflect a *quid pro quo* such as might be expected in a usual plea negotiation session. See *Robertson,* supra. There is no evidence from any source that the statement complained of was made in response to or indeed by a promise to do something other than generally to "help" appellant with his case. While such a general promise may be sufficient improper inducement where the facts show a defendant would not otherwise admit guilt, the instant case can be distinguished for the very reason that, even if an inducement can be said to have been proferred, it was not for the purpose of gaining an admission of guilt, but for gaining information of other criminal enterprises with no legal connection to appellant. In simpler terms, the apparent focus of the conversation at issue was upon the existence of drug manufacturing facilities in the area, not upon appellant's role in the offense with which he was charged. That offense, after all, had been chronicled both by eye witnesses and mechanical evidence. Given the lack of evidence of a subjective expectation that appellant was engaged in pre-conviction bargaining as defined in *Perkins,* supra, as well as the lack of objective circumstances which would support a reasonable expectation on the part of appellant, see *Robertson,* supra, we are not persuaded that either the State or appellant intended for plea negotiations to occur or that either

appellant or State took part in such negotiations. It is perhaps instructive that defense counsel used the terms *"plea-like"* twice in reference to the conversation between appellant and Easterwood. The term "like" used in that context begs the question of similarity but admits the inexact character of the conversation. Now on appeal the Court is being asked to supply the missing objective and subjective factors necessary to find an induced statement made during the plea process. We are constrained to decline that opportunity. The fact that defense counsel may have interpreted the conversation to be "plea-type" negotiations has even less weight than if appellant had been able to show, albeit unsuccessfully, that he "interpreted" a statement made by the officer to be an offer ripe for acceptance or rejection. See *Pannell v. State,* 666 S.W.2d 96 (Tex.Cr. App. 1984).

Moreover, even if we were to find that plea bargaining had occurred, which is the underlying premise of the authority upon which the Court of Appeals relies for its judgment, we would be constrained to find that the informal offer of help by Officer Easterwood, without more, was insufficient inducement to suppress the custodial statement by appellant.

Under the terms of *Robertson,* supra, *Fisher,* supra, and *Walker,* supra, we cannot state that the comment by appellant was improperly induced during the plea bargain process. And, even if made within the process, we cannot state that the informal "promise" to "help" would meet the *Fisher–Walker* test. See also *Searcy,* supra. Although Officer Easterwood may be classified as a person "in authority", see *Hanus,* supra, his promise to help was conditioned, if at all, on appellant's assistance in collateral matters and not in disposing of his own case. Appellant's "actual subjective expectation," if any, cannot be reasonably stated as one of negotiating a plea in the case at bar. Given the record before us, therefore, we hold there was no plea bargaining or negotiating in the case at bar from which any incriminating statements made by appellant should properly

have been suppressed. See *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); see also *Freeman,* supra; *Hardesty,* supra; *Washington,* supra; *Walker,* supra; *Fisher,* supra; *Richardson,* supra.

The State's ground for review is sustained. The judgment of the Dallas Court of Appeals is reversed and this cause is remanded to that court for consideration of appellant's remaining points of error.

WHITE and DUNCAN, JJ., concur in the result.

CLINTON, TEAGUE, CAMPBELL and MILLER, JJ., dissent.